## TECHE LINES, INC., *v.* BRITT.

(Division A.   Nov. 2, 1936.   Suggestion of Error Overruled Nov. 16, 1936.)

[170 So. 294.   No. 32310.]

Stevens & Currie, of Hattiesburg, and Porteous, Johnson & Humphrey, of New Orleans, La., for appellant.

Paul B. Johnson, of Hattiesburg, for appellee.

Argued orally by **George W. Currie**, for appellant, and by **Paul B. Johnson**, for appellee.

**McGowen, J.**, delivered the opinion of the court.

In an action at law for damages, Mrs. J. M. Britt, the appellee, recovered a judgment against the Teche Lines, Inc., for seven hundred and fifty dollars, and appeal is prosecuted here.

The facts sufficient to an understanding of the case are as follows: On March 8, 1935, the appellee purchased a ticket at Mobile, Ala., and took passage on a bus of the appellant for Hattiesburg, Miss. The appellee testified that when they reached New Augusta, a town in Perry county, this state, it was about mid-night, and the bus was then about seven hours late; that she heard a conversation between the bus driver and a man whom she did not know relative to the condition of the roads, and the bus driver was told that the water was rising from Leaf river a few miles ahead, and he felt sure they would not be able to pass the bridge at that point. That the bus driver said that, because of the way the bus was constructed, being higher than the usual automobile, he thought he could make the drive through regardless of the water. That there was only one other passenger on the bus, a man, and he said that he would rather not go through the water, and he told the driver of a way

around Richton, a little farther, but there would be no danger of water over the road, but the bus driver paid no attention to this. That both of them objected to going through the water. That the driver proceeded to a point where the water was over the road and stopped his bus, refusing to go any farther, and that they asked him to go back and take them to some place or town where they could get accommodations for the night. That the driver's reply was he did not have any backing lights on the bus, and because of the narrow road and culverts it would be dangerous to back without lights. That the other passenger said a village known as Mahned was only about a mile back, and that the driver might try to find them a place there, but he made no effort to go there and did not leave the bus that night. That he gave a raincoat to Mrs. Britt, and the other passenger gave her a bathrobe, as the night was cold, and it was still raining. That she was unable to sleep, and the driver turned on the heat, but, in order to do this, he had to run the motor, causing fumes which gave her a headache. That the driver retired to the back of the bus and went to sleep. That she suffered greatly because there were no toilet facilities on the bus.

She further testified that the next morning they were completely surrounded by water, and they could see a railroad only a short distance from them, and the driver could have carried them there as there was a path leading to it. That the bus driver left about seven and Mr. Williams, the other passenger, asked him what he was going to do to get them out; suggested that he might get a boat, and reminded him that they had been on the road since the day before. That they heard nothing from him until noon. That he said he had gone into Hattiesburg; that a negro porter accompanied him on his return and brought them two raincoats and two sandwiches. That near the place where the bus was stranded was a house surrounded by water, and the

people who lived there had gone into Mahned, secured a boat, come back to the bus, and carried the passengers out. That the driver placed the passengers in his car, carried them into Hattiesburg a distance of about fourteen miles, and they arrived there about three in the afternoon of March 9.

Mrs. Britt testified that she suffered continuous pain during the night due to the way she was dressed, the cold, and the anxiety, and her suffering continued for days because of the strain she had gone through, and because she had been unable to relieve her kidneys and bowels.

Mr. Solomon, the man who brought them out in the skiff, corroborated Mrs. Britt's testimony as to the time of the return of the bus driver, and as to the time they were taken from the bus to a point of safety.

The agent of the bus company in charge of their station at Hattiesburg contradicted Mrs. Britt as to her physical appearance and as to the time she arrived in Hattiesburg, fixing the time at about nine or nine-thirty A. M. He testified that it had rained every day for about two weeks prior to this incident.

Hinton, the nightwatchman at New Augusta, contradicted Mrs. Britt, in part, as to the conversation between him and the driver. He said he told the driver, when he asked about the condition of the road, that cars had come over it just about dark that night. That the bus driver said he could go through water that an ordinary automobile could not because the bus was on higher wheels and the motor was swung high.

The bus driver had been employed by the Teche Lines, Inc., for about a year, and had often driven over the route from Hattiesburg to Mobile and return. He stated that the highway was a narrow gravel road with ditches on either side and was poorly marked. He had passed over the road that day going through New Augusta about eight A. M., arriving in Mobile about two and had

started on the return trip about two-thirty. He testified that Hinton told him that out of New Augusta, about three miles, the water was over the road about six inches, and that cars had come through about dark; that when he reached the place Hinton referred to, the water was about a foot deep, but he crossed in safety; that when he came to deeper water he told the passengers he would not attempt to cross, and backed the bus about one hundred and fifty yards; that he got out and walked around the bus to see that it was all right; that he had marker and tail lights, but he did not have backing lights, and it would be dangerous to try to back without them. He stated that the passengers seemed to be in good spirits, they sat and talked awhile; that he fixed the seat for Mrs. Britt so she could rest, gave her his raincoat, and the other passenger put a heavy bathrobe over her; that he ran the motor at intervals of about twenty minutes to generate heat. He testified that when he got out the next morning at daylight, the water had risen, and that he did not have any place to turn his bus around; that he walked on the path to the railroad, at times wading waist deep in water; that when he got into Hattiesburg he changed his clothes, and secured a negro porter to go back to the bus with him; that when he saw the people with the boat he employed them to carry his passengers out. He said that Mrs. Britt seemed to be in good spirits. He denied that any one had told him any other way out. The bus, the light, the heating equipment, and all appliances were in good shape. The driver stated that he did everything in his power to get the passengers to Hattiesburg, and that they suggested that he wait until daylight, that they would rather be in the bus on land than in the bus out in the water. He tried to telephone from Bellville, but did not try to go to Mahned because he did not think any white people lived there, as all his passengers from there had been negroes.

There was evidence that a large store was situated in Mahned, which was run by a corporation; a white man was in charge there, and he had a telephone.

In view of the fact that there was no contradiction in the evidence as to the bus being equipped with the proper tail lights, this case must be reversed because of an instruction granted the plaintiff, reading as follows: "The court instructs the jury for the plaintiff that it was the duty of the defendant to equip its motor busses with a tail light." This instruction was calculated to mislead the jury into the belief that a motorbus should be equipped with lights so that it could be operated backward, and should not have been given; there was no occasion for it, as there was no dispute but that the bus was equipped with proper tail lights.

Appellant complains of instructions which required the jury to find that the bus driver had acted recklessly and wantonly as a condition upon which recovery could be had from the bus company, and insists that the use of the word "wantonly," in several instructions was equivalent to instructions for punitive damages. The court refused an instruction asked by the plaintiff allowing the jury to find punitive damages in this case. The use of the word "wantonly" merely placed a higher burden upon the appellee than was required by law, and was not prejudicial to the appellant.

Complaint is made because several instructions contained the statement that it was the duty of the driver of the bus to exercise the highest degree of care in the transportation of passengers. It is insisted that such rule cannot be invoked. We think there was no error in these instructions, because the rule is universal that the law requires the highest degree of care and skill by those engaged as carriers of passengers known to careful, diligent, and skillful persons engaged in such business, consistent with the practical operation of the road. But it may be said that a common carrier of passengers

for hire is not the insurer of the transportation of a passenger as it would be in the transportation of goods and packages. Louisville & N. R. Co. v. Compiretto, 137 Miss. 766, 102 So. 837; White v. Illinois Cent. R. Co., 99 Miss. 651, 55 So. 593, and Babbitt's, The Law Applied to Motor Vehicles (3 Ed.), page 111 et seq. We think there was no reversible error in these instructions.

Complaint is made of an instruction which told the jury that if the bus driver failed or neglected to do all that was "reasonably possible" for a good motorbus driver to do, then the defendant was guilty of negligence. The complaint is directed at the words "reasonably possible." We think the instruction is probably subject to criticism, but, considering all the instructions together, this would not be sufficient to reverse the case, nor can we find any satisfactory basis upon which to condemn the instruction as fatal to this trial.

The jury was warranted in finding, if it believed the evidence of the appellee, that the Teche Lines, Inc., had been guilty of negligence in taking no step to extricate its passengers from the situation which it, through its driver, brought about by proceeding on that highway after he was advised that the road was flooded by water, and in allowing appellee to remain on the road in the bus from midnight until two-thirty P. M. of the following day. This driver knew, or should have known, that Mahned was only a little more than a mile from his bus. He had a flashlight, he knew that road, that the water at a flooded place on that road to his rear was a depth of only twelve inches, and a jury might find that he could have relieved the inconvenient situation in a short time, even though Mahned was inhabited exclusively by negroes.

The driver was required to exercise such prudence and foresight for the safety of this passenger as a skilled and competent driver, engaged in that business, would exercise to convey his passengers with safety and

comfort, considering all the facts and circumstances detailed here.

In the discharge of this duty, the bus driver, under the law, is required to exercise a very high degree of care, caution, and prudence, and negligence on his part, which proximately caused injury to the passengers, renders the common carrier liable.

We think, in this state, it is idle to say that negroes would not render aid voluntarily, but for pay assuredly.

For the giving of the instructions with reference to the tail lights, this case must be reversed and remanded for another trial.

Reversed and remanded.